WILLIAM BETTLE, commissioner of banking and insurance,

*v.*

THE REPUBLIC SAVINGS AND LOAN ASSOCIATION.

[Decided July 10th, 1906.]

1. The issue of income stock by a building and loan association formed under the act of April 9th, 1875 (*Rev. Stat. 1875 p. 64*), authorizing the incorporation of such association, but containing no authority for the issue of such stock, was *ultra vires* the association.

2. Where a building and loan association, formed under the act of April 9th, 1875 (*Rev. Stat. 1875 p. 64*), desired to raise money to meet the necessities of its borrowing members, an'd issued certificates payable on sixty days' notice, three years after date, with interest, payment whereof was secured by real estate mortgages or cash deposited with a trustee, the holders of such certificates were not stockholders, but creditors, and entitled to be paid out of the funds held by the trustee in full, subject to no deduction for costs, expenses or premiums, with the further right to participate *pro rata* with other creditors in the assets of the association, provided the fund held by the trustee was insufficient.

3. The association could not escape liability on the ground that, as the act under which it was formed conferred no borrowing power, the borrowing of the money was *ultra vires*.

---

On petition of receiver for instructions.

*Mr. Foster M. Voorhees,* for the receiver.

BERGEN, V. C.

The defendant, an insolvent corporation, having issued certificates for the payment of money which it denominated "income stock," the holders of it demand that certain assets of the company, pledged for its security, be applied towards the redemption of these certificates in preference to the ordinary stock, such as is usually issued by a building and loan association. The defendant was organized prior to 1897, under the statute authorizing the incorporation of building and loan associations, approved April 9th, 1875, and in its articles of association provided that income stock might be issued under such terms and conditions as the directors should prescribe, the dividends on this stock, such as the directors might fix, to be in lieu of any further participation in the profits of the corporation, the holder to have the right to surrender the certificate and receive the principal of his investment within sixty days after such surrender. The articles also provided that ten per cent. of the face value of the stock, and a monthly charge of sixteen and one-half cents on each $50 paid, should be deducted for the expenses of the association.

On June 10th, 1897, the association and the Fidelity Title and Deposit Company entered into an agreement, the opening recitals being

"That whereas, the association is about to issue what is known as income stock, to be sold to investors generally, with coupons attached, payable quarterly, with interest, at the rate of six per cent. per annum; and whereas, it is desired that the said stock shall be deposited with the trustee until sold by the association, the redemption thereof, as also the payment of the coupons, to be secured as hereinafter provided."

The agreement then provided that this stock was to be deposited with the trust company and by it delivered, on the order of the association, when paid for at par, whereupon the association was to assign to the trustee real estate mortgages equal in value to the stock sold, to be held by the trustees as collateral security for the redemption of the stock, and deposit with the trustee all interest payments received on account of such mortgages towards the payment of the coupons for interest attached

to the stock certificates, and in order to save the trustee harmless, it was stipulated that the holders of the stock were to depend

"altogether upon the proceeds of such assigned mortgages for the redemption of their stock at maturity, and upon the deposits aforesaid for the payment of interest coupons,"

and in case of a default in the payment of any principal or interest due on any of said mortgages, other mortgages were to be assigned in the place of those in default, and should any of said mortgages be foreclosed, the proceeds of the sale of the mortgaged premises should be deposited with the trustee.

Some of this stock was issued, placed in the hands of the trustee, and twenty-nine certificates, representing a value, at par, of $4,800, were sold, of which $1,100 in value were redeemed before insolvency, leaving outstanding $3,700, with interest unpaid from April, 1902. About the time the stock was issued mortgages were assigned to the trustee as collateral for its redemption, but they were afterwards withdrawn and cash deposited with the trustee of an equal amount, the sum in hand at the time the receiver was appointed being $3,890.70.

The certificates were sold to investors who were not otherwise members of the association, and were in the following form (omitting formal parts) :

"This certifies that there has been paid to this corporation the sum of one hundred and fifty dollars in cash. The bearer is entitled to receive from this corporation the face value hereof, on sixty days' notice, at any time after three years from date hereof; pending such redemption, interest will be paid hereon, at the rate of six per cent. per annum, on the first days of October, January, April and July, in each year, on the presentation and surrender of the attached coupons, when payable. The principal and interest thereof are secured as certified in the trustee's certificate endorsed hereon."

The endorsement on the certificate made by the trustee recited that the association had deposited with it

"money equal in amount to the par value of the income stock called for in this certificate, or has assigned to it mortgages upon real estate represented to be of equal value, and to have been executed and recorded according to law, as collateral to secure the redemption thereof at maturity, and which money the said Fidelity Title and Deposit Company hereby agrees to apply to the redemption thereof at maturity."

The petition of the receiver admits that although the association in the first instance deposited with the trust company mortgages sufficient to cover the amount represented by the certificates issued, these mortgages were withdrawn and cash deposited in lieu thereof, and thereafter the proceeds of the sale of the stock were deposited with the trust company. It thus appears that when this receiver took possession of the assets of the association, cash representing the proceeds of the sale of all these certificates then outstanding remained in the hands of the trustee, according to the agreement made by the trustee with the purchaser and endorsed on his certificate, and by that same endorsement the trust company agreed to apply this money to the redemption of these certificates. By an arrangement with the trustee, under the direction of this court, the money was paid to the receiver, to be held by him subject to the equities which the holders of these certificates had therein, as if it yet remained in the hands of the trustee. Upon the foregoing statement of facts the receiver prays for instructions regarding the application of this special fund in the following particulars: *First.* Are the holders of such certificates entitled to be paid the full face value thereof? *Second.* Are they entitled to be paid in full the coupons past due and unpaid? *Third.* Shall there be deducted the share of the expenses of the corporation under article 15, section 5, of the articles of association, which reads, "All expense deductions on each certificate, except 'income' stock and 'investment' stock, shall remain a charge against the same?" *Fourth.* Shall there be deducted from this fund sums paid by the receiver for legal expenses incurred with respect thereto in the proceedings had in this court? *Fifth.* Are such shareholders to be treated as unpreferred creditors and entitled to share equally with other unsecured creditors?

The act under which this association was formed, and in force in 1897 when the certificates in question were issued, contained no authority for the issue of any such stock as is denominated in the articles of association "income stock," and the issue thereof would be *ultra vires* the association. The holders of the certificates now under discussion insist that they are not stockholders, but holders of a certificate of indebtedness of the asso-

ciation for money borrowed by it from them, and that under the terms of the agreement between the association and the lenders, made at the time they parted with their money, the association bound itself to deposit with the trust company, either in mortgages or cash, a sufficient security to provide for the redemption of the certificates after three years from their date, upon sixty days' notice of a request that they be redeemed; that this agreement on the part of the association and the trust company was observed, and the money necessary for their redemption always remained in the hands of the trustee, by whom it might be lawfully applied for such purpose. In opposition to this it is urged that the certificates represent stock of a special class, which the association had no authority to issue, and therefore no power to secure its payment with collateral security; that the holders of these certificates are not entitled to payment in preference to other stockholders, and can only be paid ratably with them. It was further insisted that the act under which the defendant organized does not authorize it to borrow money, and for want of such power no debt was created, and consequently there was nothing to be paid which the collateral could secure. With regard to the first objection, I am of opinion that the holders of these certificates are not stockholders, but creditors of the defendant for money loaned. These certificates do not purport to be stock, but simply a receipt for money received by the association, which it agrees to repay to the holder at a time and upon conditions therein stated. It is on its face only an obligation to pay to the bearer, with lawful interest, a fixed sum of money, and has not the necessary characteristics of a stock certificate, nor is it claimed that the holders ever undertook to exercise the rights of stockholders, or were recognized as entitled so to do. The situation, as it appears from the papers before me, was that the association desired to raise money for the purpose of meeting the necessities of its borrowing members, and offered to persons who had money to invest their obligation, payable upon sixty days' notice, three years after date, with interest at six per cent., the payment of all of which was to be secured by depositing with the trustee either mortgages on real estate or cash, and the trustee guaranteed by its endorsement

upon the certificate of indebtedness that it had, and would always retain in its hands, a sufficient indemnity to repay the money upon demand, according to the terms of the obligation. The holders of these certificates had, in addition to the obligation of the association, the guaranty of the trust company, not only that it had in hand the indemnity, but agreed, in the words of their certificate, "which money or collateral said Fidelity Title and Deposit Company hereby agrees to apply to the redemption thereof," and it seems to me that it would be inequitable to abrogate this agreement and take from the hands of the trustee the money which it now holds, and which it promised to hold, as a protection to the persons who advanced and loaned their money upon the written representation of the association and the trustee that an available security was always at hand to repay the loan upon proper demand. The trustee ought to carry out its agreement. It made itself liable to the holders of these certificates, whether they be considered as stock or obligations for the payment of money. There was nothing unlawful in the making of the guaranty by the trust company. It was within its chartered powers; and if it chose to indemnify innocent holders against an unlawful act of the association, it must keep its bargain. It has the money in hand and should apply it as it has agreed to do as between itself and the holders of these certificates.

On the argument my attention was called to two reported cases to which I shall briefly refer. The first was *In re Guardian Permanent Beneficial Building Society, 23 Ch. Div. 440.* Here the security deposited to secure the loan was required to be given up because the officers of the association, in disregard of the rules governing their powers, had authorized an unlimited borrowing, and for that reason the court held that the loan did not create either a legal or equitable debt from the society to the person making the loan, but in that case the court was influenced by the fact that in some cases the funds loaned were not applied to the payment of the obligations of the company, but "were lent to unadvanced members," and "got so mixed up in a way which renders it difficult to say how far they have been applied in one way and how far in another," but nevertheless

the court, after directing the payment of outside debts and the claims of unadvanced members, held that the surplus of the money thus borrowed could not be retained by the society, thus recognizing the right of the unlawful lender to an equitable claim against the society. The facts in the present case differ so radically from those in the case just referred to that it affords us no assistance in disposing of this matter.

The other case cited was *Towle* v. *American Building and Loan Association,* *75 Fed. Rep. 938.* There the court said that the certificates held by the claimants, and for which preference in payment was asked, was nothing more than capital stock, and that the holders thereof constituted simply a different class of stockholders. This case, however, is not applicable here, for the certificates in that case purported on their face to be stock. The only difference between the questioned stock and the other stock certificates of the same corporation was that in one case the holder had paid in full when the stock was issued, while in the other payments were to be made periodically.

More in point, however, is *Wilson's Case, L. R. 12 Eq. 521.* Here a building society borrowed from Mr. Wilson $2,001, for which he was given a written acknowledgment of the amount borrowed, together with the pledge of certain securities which were delivered to him as collateral for the payment of the loan, subject to the right of the obligor, in any of such securities, to pay the same, in which case new securities of adequate value were to be delivered and pledged in the place of those taken up. The society becoming insolvent, the public liquidator demanded the surrender by Wilson of the securities. This was refused, and the refusal sustained by the court, without passing upon the right of Wilson to enforce his securities. It, however, recognized the lien which Mr. Wilson had, and refused to disturb it or to require him to surrender the securities, leaving him to indemnify himself therewith in any manner permitted by law. In the case we are considering the security is money in the hands of a trustee for the use of the creditors, and no question of the right to reduce securities to money can arise.

The other objection made to the payment of these certificates is based upon the claim that the act under which the association

was formed confers no borrowing power, and that in the absence of such authority the borrowing of this money was *ultra vires,* because it was not properly a part of the business which the statute authorized the defendant to carry on, and therefore not a necessary incident of its corporate franchise. Whether this contention be well founded it is not necessary to determine, for I am of the opinion that this receiver, having no greater right than the corporation he represents, cannot take advantage of such an unconscionable plea, and thus escape the fulfillment of his contract, until he has restored to the other party that which the association he represents admits it secured by what it now alleges was a wrongful act. The money was borrowed to supply the members of the association with loans, for which they were applicants in the due course of the business of the association, and the general liability of the association was not increased beyond the amount of the assets received in exchange for the certificates. The stockholders were not injured even if, as claimed, the borrowing was unauthorized, because the very money borrowed, or the mortgage in which it was invested, remained in the hands of the trustee for the redemption of the certificate issued therefor, and if the association was exceeding its powers, it would seem that equity would require that the money thus obtained should be returned to the people who advanced it. No one else ought to be allowed to claim it. The contest is not between outside creditors and these claimants, but between the ordinary stockholders and those who, relying upon the representation of its officers as to the legality of their act, advanced their money upon a contract with the association which provided that such money should be secured in the manner provided in the agreement, and if such contract be *ultra vires,* the association should return the money if it would avoid the consequences of what it now claims to have been an illegal contract, from which it received a benefit, which it insists upon retaining.

The receiver will be advised that the holders of these certificates are creditors, and not stockholders; that they are entitled to be paid in full, principal and interest, and are not subject to deduction for costs, expenses or premiums, and that the fund

which the trustee held is to be first applied towards their payment, and if it be insufficient, the residue of the debt shall be paid from the assets of the association *pro rata* with other creditors.